FAIRHURST, C.J. (concurring)
*1151 ¶ 38 I disagree with the majority on three issues. I would hold that (1) expert testimony is necessary to introduce grooming evidence, (2) the prosecutor engaged in misconduct by arguing facts not in evidence, and (3) under these facts "grooming evidence" constitutes inadmissible profiling evidence because the prosecutor's arguments implicitly invited the jury to infer guilt based on the characteristics of known offenders. See State v. Braham, 67 Wash. App. 930, 937, 841 P.2d 785 (1992). Despite my disagreement, I respectfully concur with the majority's conclusion that reversal is not warranted because Todd Dale Phelps cannot establish a substantial likelihood that the prosecutor's misconduct affected the jury's verdict. In re Pers. Restraint of Glasmann, 175 Wash.2d 696, 711, 286 P.3d 673 (2012) (plurality opinion).
I. ANALYSIS
¶ 39 This court has never addressed the admissibility of expert testimony on grooming. Prior to this case, only two Court of Appeals opinions addressed this issue. State v. Quigg, 72 Wash. App. 828, 866 P.2d 655 (1994) ; Braham, 67 Wash. App. at 937, 841 P.2d 785. In Quigg, the court held that the prosecutor's witness was qualified as an expert to testify on grooming because she had over a decade of relevant professional experience. 72 Wash. App. at 837, 866 P.2d 655. The court declined to address any other issues relating to the admissibility of expert grooming testimony because the defendant failed to object to those issues at trial. Id. at 836-37, 866 P.2d 655.
¶ 40 In Braham, the Court of Appeals held that expert grooming testimony used as circumstantial evidence of *174 guilt was improper profiling evidence. 67 Wash. App. at 937, 841 P.2d 785. In that case, Howard Braham was charged with first degree child molestation after allegedly touching a child who was, along with her mother, living with Braham for three weeks. Id. at 931, 841 P.2d 785. The State indicated during pretrial motions that it intended to call the director of research for the Harborview Sexual Assault Center to present expert testimony regarding the " 'grooming process.' " Id. at 932, 841 P.2d 785. Braham's attorney objected to this evidence on the grounds that it would be irrelevant and misleading to the jury. Id. The judge allowed the expert to testify after the prosecutor assured the judge that the testimony was " 'highly relevant' " because Braham and the victim had a " 'close relationship.' " Id. at 932, 841 P.2d 785.
¶ 41 The expert testified generally about the process of grooming but did not mention anything specific about Braham or the victim:
"[T]hat ... clinical term ... has been applied to what we would call a process of victimization.... [W]hat is basically meant by that is that in most cases where sexual abuse happens, it isn't something that just happens suddenly out of the blue. Generally there is a period of time where the person who intends to abuse the child gradually gets the child to feel more comfortable and may gradually sexualize the relationship or form a bond with the child so that the child will either not understand that what's happening to them is wrong or the child will not tell anyone about it after it happens."
Id. at 933, 841 P.2d 785 (alterations in original). The prosecutor referenced the expert testimony during closing arguments, concluding that the elements of grooming were present because the evidence showed that Braham had a close relationship with the victim and that the victim fit the profile of a " '[y]oung, articulate, engaging young girl, needy, wanting a father figure.' " Id. at 934, 841 P.2d 785. The prosecutor went on to assert that Braham's grooming behavior was circumstantial evidence of his guilt. " '[T]he elements or characteristics of ... grooming ... are substantial circumstantial evidence sup *175 porting the fact that in fact the defendant did sexually touch her on her vagina in that bedroom. ' " Id. at 937, 841 P.2d 785 (alterations in original). Braham was found guilty of first degree child molestation and appealed.
¶ 42 On appeal, Braham argued that the trial court improperly admitted expert testimony *1152 about the grooming process because it was, in fact, profile testimony. "As a general rule, profile testimony that does nothing more than identify a person as a member of a group more likely to commit the charged crime is inadmissible owing to its relative lack of probative value compared to the danger of its unfair prejudice." Id. at 936, 841 P.2d 785. The Court of Appeals argued and concluded that the grooming testimony should have been excluded because it had "virtually no probative value under ER 401" and was unfairly prejudicial.[1] Id. at 938-39, 841 P.2d 785. The court explained that grooming testimony had little probative value because, contrary to what the prosecutor told the trial court, it was not needed to show that Braham had a greater opportunity to commit the crime:
Indeed, we are unable to conceive of any basis for [the] admission [of grooming testimony] in this case. Surely, expert opinion is not necessary to explain that an adult in a "close relationship" with a child will have greater opportunity to engage in the alleged sexual misconduct. Under the facts presented here, we see no other value to this evidence.
Id. at 937-38, 841 P.2d 785. The court held that the "prosecutor exhorted the jury to infer guilt based on [the expert's] testimony," id. at 937, 841 P.2d 785, and that the testimony was particularly prejudicial because it establishes the profile of a typical perpetrator rather than a typical victim:
*176 The unwarranted implication of guilt is particularly prejudicial where, as here, the expert testimony establishes a profile of the typical perpetrator rather than the typical victim. Perpetrator profile testimony clearly carries with it the implied opinion that the defendant is the sort of person who would engage in the alleged act, and therefore did it in this case too.
Id. at 939 n.6, 841 P.2d 785. The court held that the erroneous admission of grooming evidence could have affected jury deliberations and reversed and remanded for a new trial. Id. at 940, 841 P.2d 785.
¶ 43 In the instant case, the prosecutor used the term "grooming" or "groomed" in front of the jury more than 30 times without introducing lay or expert testimony. During voir dire, the prosecutor explicitly introduced the concept of grooming in the context of rape and child molestation and discussed grooming at length with nine potential jurors:
[PROSECUTOR]: Now, has anyone here heard in the realm of sexual assault, rape, child molestation, anything like that, has anyone heard of the word grooming? Raise your hand, please.
Number 10, grooming, what does that mean to you?
JUROR NO. 10: Grooming, the context I'm thinking of is grooming of a victim to be assaulted.
[PROSECUTOR]: Okay. Can you elaborate a little bit for me?
JUROR NO. 10: Well, yeah. Spending time with the child or with the-you know, with the victim, gaining trust of the victim, basically preparing the victim to make the next move.
[PROSECUTOR]: Okay. Did everybody hear that? Anybody not hear it?
....
[PROSECUTOR]: Right. Okay. So is that part of the process, the perpetrator when they're grooming not just the victim but other folks around the victim maybe? Just what you said-
JUROR NO. 9: Well, I suppose it could be. I don't know.
....
[PROSECUTOR]: Okay. Now, but what about isolating them from their other friends? Is that something that ... I'm just *177 throwing these out here, I mean, if you're not familiar with any of these. But please speak up if you are. *1153 Number 21, is that a-if you're grooming someone and you're trying to gain a trust relationship to groom them, is it possible that you're going to try to isolate that victim from the other people that victim trusts in their life?
JUROR NO. 21: Yeah.
1 Verbatim Report of Proceedings (VRP) Voir Dire (Apr. 17, 2012) at 113-16 (emphasis added) (last alteration in original).
¶ 44 During the State's redirect of a witness, the prosecutor asked the witness if she "kn[e]w anything about grooming." 2 VRP (Apr. 18, 2012) at 211. Phelps objected, arguing relevance. The trial court sustained the objection, stating, "That's an issue that is for expert testimony. She is not an expert. She's already stated she's not an expert. So I'm sustaining the objection." Id. Despite this declaration from the judge, the State proceeded to discuss grooming without introducing any expert testimony on the grooming process.
¶ 45 In closing, the prosecutor discussed different ways that a perpetrator can groom a victim and those around a victim. He referenced the discussion in voir dire:
Then we talked about grooming. We talked about the process of grooming. And some people came up with examples of how someone who is grooming is going to be nice. They are going to try to get the trust of someone. They are going to try and isolate that person so that they can do an act against this person who is being groomed. And it's not just the person who is being groomed, but it's other people that are around as well that are being groomed.
8 VRP (Apr. 26, 2012) at 1493 (emphasis added). The prosecutor then proceeded to tell the jury that Phelps' behavior was "called grooming." Id. at 1549. "The iPod texts deleted, again, by [A.A.] to protect him. So where are we at? So now we're in a position where [A.A.] has to pay because she tried to protect him. Do you know what this is called? It's called grooming.
*178 And she was groomed well." Id. (emphasis added).[2] In summing up his argument, the prosecutor implied that the case is actually about grooming:
So why are we here? We're here because of grooming, we're here because of deceit, concealment, half-truths, misrepresentations. And there's only one adult in this entire case who had control over everything that happened in this case. One person who had the control and the authority to control the flow of information and the people involved. And that's that guy right there.
Id. at 1548 (emphasis added). During rebuttal, the prosecutor argued that grooming explains why Phelps did not call Child Protective Services (CPS):
As concerned as the defendant was for [A.A.], not one time, we haven't heard any information that he ever called CPS, that he ever called law enforcement, nothing. That's how concerned he was. He was grooming everybody else. Remember, he was the one that was putting out the severe information that she was going to commit suicide. Everybody else was familiar with it. And he was the one telling his family, hey, this is a real big deal. Think it was played up quite a bit.
Id. at 1591. During closing argument and rebuttal, the prosecutor used the term "grooming" or "groomed" a total of 26 times and displayed the word "grooming" or "groomed" on 8 different PowerPoint slides. Id. at 1493-1553, 1580-91 (closing and rebuttal); Pers. Restraint Pet., App. 1.
¶ 46 The majority suggests that grooming is a concept within the common knowledge of jurors and argues that grooming evidence need not be introduced through expert testimony.[3] I respectfully disagree. The dictionary defines the verb "groom" as
*1154 *179 a : to attend to the cleaning of (as an animal); esp : to maintain the health and condition of the coat of (as a horse) by brushing, combing, currying, or similar attention ... b : to bring about or increase the acceptability or attractiveness of (as one's physical appearance) esp. by carefully attending to details of cleanliness and neatness : freshen up : spruce up ... make neat ... d : to get into readiness for some specific objective.
WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1001 (2002).
¶ 47 "Grooming," in the sexual assault context, refers to a calculated pattern of psychological behaviors used by sex offenders to gain the trust of potential victims before assaulting them. Marjorie A. Shields, Annotation, Admissibility of Expert Testimony on Grooming Behavior Involving Sexual Conduct with Child, 13 A.L.R.7th, Art. 9, §§ 1-2 (2016). The court in Quigg explained that grooming was "a process by which child molesters gradually introduce their victims to more and more explicit sexual conduct." Quigg, 72 Wash. App. at 833, 866 P.2d 655. The fact that the prosecutor specifically said that he was interested in discussing grooming " 'in the realm of sexual assault, rape, [and] child molestation' " strongly suggests that the prosecutor intended to invoke the psychological, rather than the ordinary, definition of "grooming." In re Pers. Restraint of Phelps, 197 Wash. App. 653, 663, 389 P.3d 758 (2017) (quoting 1 VRP Voir Dire at 113).
¶ 48 The majority concludes that the prosecutor did not need to introduce grooming evidence through an expert witness here because the prosecutor did not use grooming as a fact in evidence. "[The prosecutor] used grooming to paint a picture of the evidence for the jury. Grooming is descriptive of how Phelps's and A.A.'s relationship began, developed, and expanded and in reality has or adds little *180 value to what the State needed to prove: that Phelps committed the crimes." Majority at 1148. The record suggests that the prosecutor provided the jury with his own definition of "grooming" and told the jury that Phelps met that definition. In closing argument he presented the jury with PowerPoint slides that said, "GROOMING-NICE, TRUST, ISOLATE" and "GROOMING-NEVER IN THE OPEN," then showed a list of Phelps' behaviors with the word "GROOMING " in bold at the top. Pers. Restraint Pet., App. 1, at 14, 34, 81. The prosecutor then proceeded to tell the jury, repeatedly, that Phelps' behavior constituted grooming:
What is all this stuff that's going on? What is all this physical contact between a coach and a student athlete? It's grooming ; it's okay, every time I touch you, it's okay, it's okay. Eventually, it becomes the norm. The grooming isn't in the open, folks. When people groom, they don't do it so everybody can see. That's not the way it works. It wouldn't be called grooming. It would be called a crime because he'd be caught all the time.
8 VRP at 1506-07 (emphasis added). "He leans into the seat, and it's dark out, and he takes his hand and puts it between her legs. Again, grooming. He already knows she's not going to respond." Id. at 1513 (emphasis added). "What I am suggesting is he was grooming her just like he was grooming everybody else, that these issues are [A.A.'s], and he's not a bad guy." Id. at 1517-18 (emphasis added). "These are the things that are going on that she's being told and groomed with throughout their contacts." Id. at 1522 (emphasis added). "She's a prime candidate for grooming, to be manipulated. And that's exactly what happened in this case." Id. at 1540 (emphasis added). "She says [A.A.'s] obsessed with her dad. Maybe that might be true. Maybe she was. But she's being groomed ." Id. at 1542 (emphasis added).
¶ 49 When the prosecutor gave the jury his own definition of "grooming behavior" and asserted that Phelps' behavior *181 falls within that definition, the prosecutor was, in essence, saying that Phelps' behavior is consistent with a specific set of calculated psychological behaviors. The prosecutor does not *1155 get to provide, through argument, facts not in evidence.
¶ 50 The Court of Appeals correctly determined that "[t]he psychological complexities in understanding and evaluating the grooming process demand expert testimony to aid the jury." Phelps, 197 Wash. App at 679, 389 P.3d 758.[4] Courts in other states and federal circuits recognize that grooming testimony requires specialized knowledge and falls within the scope of ER 702, governing the admissibility of expert testimony. See, e.g., State v. Berosik, 2009 MT 260, 352 Mont. 16, 23, 214 P.3d 776 ; State v. Sorabella, 277 Conn. 155, 211-14, 891 A.2d 897 (2006) ; Morris v. State, 361 S.W.3d 649, 659-62 (Tex. Crim. App. 2011) ; State v. Akins, 298 Kan. 592, 315 P.3d 868 (2014) ; Shields, supra, 13 A.L.R. 7th, § 4 (explaining that expert testimony on grooming has been ruled admissible by the Third, Fifth, Seventh, Ninth, and Tenth United States Circuit Courts of Appeals and the courts of 15 different states plus the District of Columbia). Because grooming testimony requires specialized knowledge and falls within the scope of ER 702, it necessarily falls outside the scope of ER 701, precluding its introduction through lay testimony. See ER 701. Thus, grooming testimony, if admissible under ER 403, may only be introduced through an expert witness. See ER 701, 702.
¶ 51 Even when grooming evidence is introduced through expert testimony, the trial court must be careful to ensure it *182 does not constitute improper profiling evidence. The majority holds that the State's use of grooming here does not constitute improper profiling evidence because Braham is factually distinguishable. Specifically, the majority distinguishes Braham on the grounds that the prosecutor in this case did not use grooming behavior as circumstantial evidence of the defendant's guilt. I respectfully disagree. Just like in this case, the prosecutor in Braham charged the defendant with child molestation-a crime that does not require proof of grooming behavior. RCW 9A.44.083. And just like in this case, the prosecutor's closing arguments in Braham focused on characterizing the defendant's actions as grooming:
"[The expert] told you that it is typical in grooming, the offender is going to have a relationship of some kind with the victim. In this case it was almost a father-daughter relationship.... [A.H.] likes Uncle Craigie. He is her daddy at a time when she doesn't have her own dad there....
"....
"[T]he elements or characteristics of ... grooming that [the expert] explained to you this morning [are here]."
67 Wash. App. at 934, 841 P.2d 785 (some alterations in original).
¶ 52 The court in Braham held that the State's grooming arguments were unduly prejudicial because they implied guilt based on the characteristics of known offenders. "Expert testimony implying guilt based on the characteristics of known offenders is the sort of testimony deemed unduly prejudicial and therefore inadmissible. This was exactly how the State used Ms. Berliner's testimony in this case." Id. at 937, 841 P.2d 785 (citations omitted). I think the prosecutor's grooming arguments in this case are just as prejudicial as the arguments in Braham. By referencing grooming behavior 30 times over the course of the trial, the prosecutor implicitly invited the jury to associate the defendant with a group of people more likely to commit the crime. See id. at 939 n.6, 841 P.2d 785 ("Perpetrator profile testimony clearly carries with *183 it the implied opinion that the defendant is the sort of person who would engage in the alleged act, and therefore did it in this case too."). Under these facts, the risk of unfair prejudice associated with the concept of grooming is substantially outweighed by the probative value of the evidence. *1156 [5] Thus, even if the prosecutor had attempted to introduce expert testimony on grooming, that testimony would be inadmissible under ER 403.
¶ 53 The main difference between this case and Braham is that the prosecutor in this case did not introduce any expert testimony to establish a foundation for his grooming arguments. In my view, this error compounds the seriousness of his misconduct-not only did the prosecutor introduce improper profiling testimony but the prosecutor introduced it himself without an expert witness. However, because Phelps failed to object at trial, these errors are waived unless he establishes that the misconduct was so flagrant and ill intentioned that no instruction could have cured the resulting prejudice. See Glasmann, 175 Wash.2d at 704, 286 P.3d 673. Repeated references to inadmissible and inflammatory evidence constitute serious misconduct, but in my view, the resulting prejudice could have been neutralized by a curative instruction. Reluctantly, I agree with the majority that reversal is unwarranted because Phelps cannot establish a substantial likelihood that the misconduct affected the jury's verdict. Majority at 1150; Glasmann, 175 Wash.2d at 711, 286 P.3d 673.
Madsen, J.
Wiggins, J.
González, J. (concurring)
*184 ¶ 54 I fully join the majority but write separately to discuss the term of art "prosecutorial misconduct." The State makes a convincing argument for us to stop using "misconduct" to describe mistakes made by prosecutors because of how harsh the label is and because of the consequences for individual prosecutors who commit error. Mot. for Discr. Review at 13 ("When courts use the word 'misconduct' ... it perpetuates a confusion to the general public that every instance of 'prosecutorial misconduct' is the equivalent of professional misconduct.").
¶ 55 The same observation applies to similarly harsh labels describing the erroneous conduct of judges and criminal defense lawyers. We use equally unforgiving labels to describe trial judge errors as an "abuse of discretion" and mistakes by criminal defense lawyers as "ineffective assistance of counsel." We do not find easily, or take lightly, misconduct, abuses of discretion, or ineffectiveness.
¶ 56 My worry is that if we replace these terms of art with softer labels, we may make the findings more often. The labels themselves should give us pause before reaching such conclusions. While I am open to reconsidering this view, I am not there yet.

The court refrained from holding that such evidence will always be inadmissible, explaining that expert testimony on grooming may be more probative under different circumstances. For example, grooming evidence may be admissible if offered as rebuttal evidence after the defense claims a perpetrator's conduct is inconsistent with those who commit abuse or rape. Braham, 67 Wash. App. at 938, 841 P.2d 785. It may also be admissible to explain a victim's behavior, such as delayed reporting. Id. at 938 n.5, 841 P.2d 785.

The prosecutor even claimed, repeatedly, that Phelps was grooming the other adults in A.A.'s life-but there is no support in the expert testimony provided in other published cases in Washington that the concept of grooming applies to anyone other than the victim. See Quigg, 72 Wash. App. 828, 866 P.2d 655.

The majority does not explain what the definition of "grooming" is or whether that definition is within the common knowledge of jurors. The majority simply says that "[w]e have never held that jurors need expert testimony to establish that a defendant manipulated or controlled someone; jurors can understand these concepts based on common sense and experience." Majority at 1148. The majority goes on to say that "grooming" can be used interchangeably with "manipulating" and suggests that the concept of "grooming" is related to the concepts of "developing trust" and "isolation." Id.

Whether grooming evidence requires expert testimony is an issue of first impression in Washington, but our case law strongly suggests that evidence of a specific psychological profile is properly introduced through expert testimony. See, e.g., Quigg, 72 Wash. App. at 837, 866 P.2d 655 (holding that an expert was qualified to testify about the grooming process); State v. Allery, 101 Wash.2d 591, 682 P.2d 312 (1984) (evidence of battered women's syndrome introduced through expert testimony); State v. Ciskie, 110 Wash.2d 263, 751 P.2d 1165 (1988) (same); State v. Janes, 121 Wash.2d 220, 850 P.2d 495 (1993) (evidence of battered child syndrome introduced through expert testimony).

Grooming evidence is no more probative here than it was in Braham. The court in Braham explained that grooming evidence is irrelevant because it is not necessary to explain that an adult in a close relationship with a child will have a greater opportunity to engage in sexual misconduct. 67 Wash. App. at 937-38, 841 P.2d 785. The same reasoning applies here-grooming evidence is not necessary to explain that a softball coach with a close relationship to a young player will have a greater opportunity for misconduct. Furthermore, arguing that Phelps was grooming others around A.A. is certainly not necessary to prove that Phelps was guilty of molesting A.A.